## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Scott W. DiBiasio,

Plaintiff/Counter-Defendant

v.                                                        Civil Action No. 1:07-cv-00300 (PLF)

Plasma Protein Therapeutics Association,

Defendant/Counter-Plaintiff.

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plasma Protein Therapeutics Association ("PPTA"),

through its attorneys, hereby moves this Court to enter a temporary restraining order ("TRO")

and preliminary injunction requiring Plaintiff and Counter-Defendant Scott W. DiBiasio

("DiBiasio") to (1) produce his personal computer(s) for inspection and imaging by a computer

forensic expert; (2) return any and all PPTA documents in his possession; (3) refrain from

revealing or using any PPTA documents or information that he has already accessed or stored;

and (4) refrain from accessing or seeking to access any PPTA computer or e-mail systems in the

future.

As set forth more fully in the accompanying Memorandum of Law, a TRO is necessary

because DiBiasio has demonstrated that he is in the possession of PPTA confidential, proprietary

and privileged information and documents without authorization and in violation of his

contractual and statutory obligations.  Mr. DiBiasio has already disclosed such documents to

third parties and had attempted to use them against PPTA in this litigation.   In light of this

information, PPTA filed counterclaims against Mr. DiBiasio asserting (1) breach of contract, and

(2) violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* on June 15, 2007. Without access to DiBiasio's computer(s) and disks upon which these documents are stored, PPTA cannot adequately prosecute its counterclaims against DiBiasio or have any accurate idea of how many confidential, proprietary, and/or privileged PPTA documents DiBiasio possesses. DiBiasio has refused to provide any assurance that his computer(s) will be produced for inspection or that he will refrain from modifying, deleting, or destroying his computer(s) or any information thereon until this inspection has occurred.

PPTA has a strong likelihood of success on the merits, no adequate remedy at law, and will continue suffering irreparable harm unless DiBiasio is required to produce his computer(s) for inspection and refrain from further disclosing any such documents and confidential information he currently possesses.

PPTA respectfully moves the Court for a TRO and preliminary injunction requiring DiBiasio to:

1. Produce his personal computer(s) for inspection and imaging by a computer forensic expert;

2. Return any and all PPTA documents in his possession;

3. Refrain from revealing or using any PPTA documents or information that he has already accessed or stored; and

4. Refrain from accessing or seeking to access any PPTA computer or e-mail systems in the future.

PPTA is providing notice of these presentments to DiBiasio's counsel and prays the Court for a hearing on the TRO within two days.

Dated:  June 18, 2007                                Respectfully submitted,


                                                     By:  ___/s/_____
                                                          David J. Ervin
                                                          Joanna E. Baden-Mayer
                                                          KELLEY DRYE & WARREN LLP
                                                          3050 K Street NW Ste. 400
                                                          Washington, D.C.  20007
                                                          Telephone: 202-342-8400
                                                          Facsimile: 202-342-8451


                                                          ___/s/_____
                                                          Barbara E. Hoey*
                                                          KELLEY DRYE & WARREN LLP
                                                          101 Park Avenue
                                                          New York, New York  10178
                                                          (212) 808-7800
                                                          (212) 808-7897 (facsimile)


                                                     * Admitted *Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Scott W. DiBiasio,

               Plaintiff/Counter-Defendant

v.

Plasma Protein Therapeutics Association,

               Defendant/Counter-Plaintiff.

Civil Action No. 1:07-cv-00300 (PLF)

## MEMORANDUM OF LAW IN SUPPORT OF PPTA'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant and Counter-Plaintiff Plasma Protein Therapeutics Association ("PPTA"), through its attorneys, hereby moves this Court, pursuant to Fed. R. Civ. P. 65, to enter a temporary restraining order ("TRO") and preliminary injunction requiring Plaintiff and Counter-Defendant Scott W. DiBiasio ("DiBiasio") to (1) produce his personal computer(s) for inspection and imaging by a computer forensic expert; (2) return any and all PPTA documents in his possession custody or control; (3) refrain from revealing or using any PPTA documents or information that he has already accessed or stored; and (4) refrain from accessing or seeking to access any PPTA computer or e-mail systems in the future.

## I.    INTRODUCTION

This motion is necessary to prevent the spoliation of highly relevant evidence that PPTA requires in order to prosecute its counterclaims against the Plaintiff, and to secure Defendant PPTA's attorney-client privileged information, as well as potentially voluminous amounts of PPTA's confidential and proprietary information, currently in the

1

possession of the Plaintiff.

During discovery, Plaintiff Scott W. DiBiasio ("DiBiasio") produced documents to PPTA evidencing that he is in the possession of an as yet unknown amount of PPTA confidential and proprietary information and documents – including attorney-client and work product privileged memoranda. DiBiasio produced documents including both: (i) e-mails that DiBiasio acquired during and by reason of his employment with PPTA and improperly retained after he was terminated, and (ii) e-mails and documents to which Plaintiff should never have had access. PPTA has strong reason to believe that these documents currently reside on Mr. DiBiasio's personal computer(s) or disks[1]. DiBiasio has revealed certain of these documents to third parties, and has attempted to use them against PPTA in this litigation.

On June 15, 2007, PPTA sought leave to file a supplemental answer asserting counterclaims against DiBiasio based on this newly discovered information. However, without access to DiBiasio's computer(s) and any disks in DiBiasio's possession on which these documents reside, PPTA cannot know with certainty how many confidential PPTA documents DiBiasio possesses, the nature of these documents, or how Mr. DiBiasio has used or plans to use these documents against PPTA in the future. Without this information, it will be impossible for PPTA to fully prosecute its counterclaims against DiBiasio or to have any reasonable certainty that the confidential and proprietary information of PPTA and its members is secure. PPTA cannot even be certain, without inspection of DiBiasio's computer(s), whether DiBiasio still has access to PPTA computer or e-mail systems. Injunctive relief is also necessary to prevent DiBiasio from

---

[1]     The Court can see from the face of the documents that the e-mails were printed out from DiBiasio's computer hard-drive.

in any way using or revealing whatever confidential or proprietary PPTA documents or information he has obtained and ensure the security of PPTA's confidential, proprietary, and trade secret information.

## II.    FACTS

### A.    Background

PPTA is the trade association and standard setting organization that serves as the primary advocate for the world's leading source plasma collectors and producers of plasma-based and recombinant biological therapeutics.  PPTA works cooperatively with patient groups, policymakers, regulatory agencies and other stakeholders to address critical issues that impact the industry and patients who depend on plasma protein therapeutics.  A large part of PPTA's business involves lobbying on the state and federal level.

Plaintiff DiBiasio was employed by PPTA from October of 2003 to October of 2005 as a state lobbyist.  Mr. DiBiasio's superiors included Julie Birkofer, Executive Director of PPTA North America (his direct supervisor), Terry Del Prete, Vice President of Operations, and Jan Bult, PPTA's President.

The business of PPTA is confidential.  PPTA communicates with its members about legislation, regulatory action and other activity potentially impacting the plasma industry.  There is also communication about new discoveries and scientific advances in the industry – the publication of which could severely damage PPTA and its members.

3

**B.    Evidence of DiBiasio's Possession of PPTA Confidential and Proprietary Information and Documents**

Scott DiBiasio was employed by PPTA until October 25, 2005. As the result of his employment, DiBiasio had access to PPTA's e-mail and document storage systems, which contain proprietary, confidential information concerning PPTA and its members.

For that reason, DiBiasio – as all PPTA employees – was required to sign a Confidentiality and Non-Compete Agreement (the "Confidentiality Agreement"). That Confidentiality Agreement, attached hereto as Exhibit "A," obligated DiBiasio to, among other things, keep all PPTA materials confidential and return all PPTA materials to PPTA upon termination of his employment. Just prior to PPTA's termination of DiBiasio's employment with PPTA, DiBiasio informed PPTA staff that he had been forwarding all PPTA business-related e-mails from his PPTA e-mail account to his personal e-mail account since May 10, 2005. This was unauthorized. DiBiasio alleged that he did this after he made a complaint of sexual harassment for his "own protection." *See* Declaration of Terry Del Prete, attached hereto as Exhibit "B," at ¶ 3. Upon DiBiasio's termination, PPTA's Vice President of Operations demanded that DiBiasio return all PPTA property that he had in his possession. Del Prete Decl. at ¶ 4.    On October 27, 2005, Mr. Del Prete demanded and requested confirmation from DiBiasio that he had deleted all PPTA e-mails from his personal computer/system. DiBiasio confirmed via e-mail to PPTA on November 1, 2005 that this had been "Completed." *See* Nov. 1, 2005 e-mail from Scott DiBiasio to Terry Del Prete, attached hereto as Exhibit "C."[2]

These representations by DiBiasio were false. On May 30, 2007, DiBiasio, through his attorney, produced to PPTA, in response to PPTA's First Set of Requests for

---

[2]    Deletion of such e-mails was required by PPTA's confidentiality agreement, discussed in further detail *infra* at 8.

4

Documents, numerous PPTA business-related e-mails which DiBiasio obtained during and by reason of his employment with PPTA. These documents, produced as part of Attachment 4 to DiBiasio's responses to PPTA's document requests, are attached hereto as Exhibit "D."

Even more troublingly, DiBiasio also produced the following: (1) a confidential and attorney-client privileged memorandum concerning this case created by a PPTA staff member, and sent to counsel, on a date subsequent to DiBiasio's termination, and (2) numerous PPTA business-related e-mails on which DiBiasio was neither a sender nor a recipient, four of which were e-mails created subsequent to DiBiasio's termination. These documents, produced as part of Attachments 4 and 7 to DiBiasio's responses to PPTA's document requests, are attached hereto as Exhibit "E." Many of these documents and e-mails are marked, along the bottom of each page, "file://D:\Documents and Settings\Scott\My Documents\PPTA Email\GroupWise WebAcce... 5/14/2007," suggesting that they were printed from DiBiasio's personal computer on May 14, 2007.

DiBiasio's possession of an attorney-client privileged memorandum and other confidential PPTA e-mails is highly disturbing. DiBiasio was at no time authorized to access or possess the e-mails on which he was neither a sender nor a recipient, nor was he authorized by PPTA to access or possess the privileged memorandum. This memorandum was drafted Ms. Julie Birkofer, e-mailed to Terry Del Prete, and forwarded to counsel. It was not distributed to any other PPTA staff, and was not provided or made available to Mr. DiBiasio by either Ms. Birkofer or Mr. Del Prete. *See* Del Prete Decl. at ¶¶ 8-9.

**C.    DiBiasio's Refusal to Explain his Possession of these Documents or Produce his Computer(s) for Inspection**

PPTA has made multiple attempts to obtain DiBiasio's computer(s) for a forensic inspection without involving this Court. On June 7, 2007, PPTA wrote to DiBiasio's attorney requesting: (a) an immediate explanation as to how he and his client came into possession of the confidential and privileged documents contained in DiBiasio's document production; (b) the prompt return of these and any other PPTA documents in DiBiasio or his attorney's possession (with written confirmation that this had been accomplished); (c) written certification that DiBiasio has not and does not have access to any PPTA computer or server; and (d) preservation of any personal computers owned or used by Mr. DiBiasio. *See* June 7, 2007 Letter to Alan Lescht, attached as Exhibit "F." The following day, PPTA served DiBiasio's counsel with a Request for Inspection (the "Request") seeking access to DiBiasio's computers. *See* Exhibit "G." PPTA's counsel received only an e-mail from DiBiasio's attorney stating only that **"**the document was shredded**"** *See* Exhibit "H."

Since this "response" was insufficient, and did not address when PPTA would have access to DiBiasio's computer(s), PPTA's counsel sent a second letter on June 11, 2007, demanding written confirmation that the original and any paper copies of the privileged memorandum had been destroyed, a separate written certification from DiBiasio confirming that all paper versions of the document had been destroyed, and a written explanation as to how DiBiasio came into possession of the PPTA documents. *See* June 11, 2007 Letter to Alan Lescht, attached as Exhibit "I." That same day, DiBiasio's counsel notified PPTA that DiBiasio would not be appearing for his deposition, scheduled for June 14, 2007, thereby depriving PPTA of its opportunity to

6

directly ask DiBiasio, under oath, how he gained access to PPTA's documents and whether he had any other property belonging to PPTA.

The following day, on June 12, 2007, PPTA's counsel again wrote to DiBiasio's attorney to ask, yet again, when a response to their June 7, 2007 letter would be provided. *See* June 12, 2007 Letter to Allan Lescht, attached as Exhibit "J."

PPTA has yet to receive any written response to these letters or to the Request for Inspection other than counsel's motion to withdraw.  As such, PPTA has no assurance that its confidential and proprietary information and documents are secure, and no assurance that DiBiasio is not still accessing PPTA's computers or systems.

In order to return things to the *status quo*, this Court should issue a temporary restraining order requiring Plaintiff DiBiasio to (1) produce his personal computer(s) for inspection and imaging by a computer forensic expert, (2) return any and all PPTA documents in his possession; (3) refrain from revealing or using any PPTA documents or information that he has already accessed or stored; and (4) refrain from accessing or seeking to access any PPTA computer or e-mail systems in the future.

## III.    ARGUMENT

### A.    The Standard for Temporary and Preliminary Injunctive Relief

To obtain a temporary restraining order or preliminary injunction in this Circuit, the plaintiff must demonstrate that: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the defendant; and (4) the public interest will be furthered by an injunction. *Mova Pharm. Corp. v. Shalada,* 140 F. 3d 1060, 1066 (D.C. Cir. 1998) (*quoting CityFed Fin. Corp. v. Office of Thrift Supervision,*

58 F.3d 738, 746 (D.C. Cir. 1995)); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001). No one factor is dispositive. Rather, the factors must be balanced against each other on a sliding scale, such that particularly strong arguments for one factor can support injunctive relief, even when the arguments for other factors are weak. *See CityFed,* 58 F.3d at 747. The likelihood of success is the most important factor, and a showing of a strong likelihood of success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors. *Morgan Stanley,* 150 F. Supp. at 72-73.

Injunctive relief is appropriate where a former employee misappropriates and/or retains confidential information belonging to a former employer,[3] and PPTA's likelihood of success on the merits in this case is so great that even a moderate showing of irreparable harm would be sufficient to support a temporary restraining order and injunctive relief. Nonetheless, and as explained in further detail below, all four factors strongly and equally weigh in favor of the issuance of a temporary restraining order and preliminary injunctive relief in this case.

## B.    PPTA Has a Substantial Likelihood of Success on the Merits of its Claims

The Court is not required to find that ultimate success by the movant is probable, only that it is substantially likely. *Morgan Stanley,* 150 F. Supp. at 72. For the reasons

---

[3]    *See, e.g., Zadodnick v. Int'l Bus. Machines Corp.,* 135 F.3d 911, 915 (4th Cir. 1997) (granting employer's request for injunctive relief prohibiting former employee from disclosing employer's confidential materials to third parties and requiring employee to return all confidential materials to the employer); *Haught v. Louis Berkman LLC,* 417 F. Supp. 2d 777, 787 (W.D.Va. 2006) (granting injunctive relief requiring former employee to "return all confidential documents she had misappropriated" and enjoining her "from further disclosing [the employer's] confidential information to any third party.").

set forth below, however, PPTA can show that ultimate success is more than probable, it is nearly certain.

### 1.    Plaintiff Breached his Confidentiality Agreement with PPTA

On October 29, 2003, DiBiasio signed PPTA's Confidentiality Agreement as a condition of his employment with PPTA. *See* Exhibit "A." The terms of this Confidentiality Agreement required DiBiasio to (1) refrain from revealing business or professional secrets or other personal or confidential information related to PPTA or its members that he may have learned during the exercise of assigned functions or professional activities at PPTA, and (2) return to PPTA all business-related and confidential information, including copies in any form, immediately upon termination for any reason. *See id.*

As noted above, DiBiasio admitted to PPTA staff prior to his termination that he had been forwarding all PPTA business related e-mails from his PPTA e-mail account to his personal e-mail account for approximately five months. Pursuant to the Confidentiality Agreement, DiBiasio was to return these and any other business-related and confidential information to PPTA upon his termination. DiBiasio's document production in this litigation proves, without question, that DiBiasio retained PPTA business-related documents long after his termination, and at least until May 14, 2007. DiBiasio's retention of these documents is a clear and inexcusable breach of the Confidentiality Agreement.

In *JDS Uniphase Corp. v. Jennings,* 473 F. Supp. 2d. 697, 704-05 (E.D. Va. 2007), Judge Ellis of the Eastern District of Virginia granted summary judgment to an employer on a breach of contract claim based on facts strikingly similar to those in this

case. The defendant, a former employee, had wrongfully retrieved and taken documents belonging to his employer, and claimed that he did so because he believed these documents would assist him in his Sarbanes-Oxley Act whistleblower lawsuit against the employer. The District Court held that "an employee, even if aggrieved, should not engage in self-help by wrongfully retaining and employer's documents; but instead the employee should file suit and seek the documents via subpoena." *Id.*

DiBiasio, like the defendant in *Jennings*, breached his Confidentiality Agreement by taking these documents and breached it again by disclosing these documents – as well as other privileged and confidential documents to which he should never have had access – to third parties. PPTA cannot be sure of the full extent of DiBiasio's disclosure of PPTA's confidential materials, but can be sure that DiBiasio disclosed these documents to his attorneys, who produced such documents to PPTA in this litigation. Disclosure to a party's attorney is disclosure to a third party, just as disclosure to any other individual. *See, e.g., Zadodnick,* 135 F.3d at 915 (granting summary judgment on employer's counterclaim for breach of nondisclosure agreement where employee "retained confidential materials belonging [employer] after termination of his employment and forwarded those documents to his counsel without [the employer's] consent").

DiBiasio's conduct and breach of the Confidentiality Agreement have caused PPTA damages and will continue to cause damages until an injunction is issued. Moreover, PPTA cannot begin to assess the full extent of its damages until it gains access to DiBiasio's computer(s) and conducts discovery pursuant to its counterclaims.

**2.    Plaintiff Violated the Computer Fraud and Abuse Act**

Section 1030(a) of the federal Computer Fraud and Abuse Act ("CFAA" or "the Act") makes it a crime to cause or attempt to cause damage by intentionally accessing a protected computer without authorization or in excess of authorized access, and, as a result of such conduct, cause one or more persons loss of at least $5,000 in a one-year period. 18 U.S.C. § 1030(a)(5)(A)(iii) and (B)(i). The Act provides the injured person with a civil cause of action against the violator to obtain injunctive relief, compensatory damages, and other equitable relief. 18 U.S.C. § 1030(g).

The facts make clear that Plaintiff has violated the ACT and that PPTA is entitled to relief. PPTA's computer network and its e-mail system are maintained on computers that are used in interstate commerce and communication, and therefore are "protected computers" within the meaning of the Act. *See* 18 U.S.C. § 1030(e)(2)(B). Plaintiff accessed PPTA's computers in excess of his authorization and without authorization. Specifically, DiBiasio:

> (1)    Forwarded e-mails from his PPTA e-mail account to his personal e-mail account with the intent to use such e-mails against PPTA and kept such e-mails stored on his computers subsequent to termination and without authorization; and
>
> (2)    Gained unauthorized access to PPTA's e-mail systems to obtain privileged and confidential documents subsequent to his termination and thereafter forwarded and/or saved such PPTA documents to his own personal computer(s) for the purpose of using them against PPTA.

DiBiasio's access to the PPTA system was intentional and unauthorized. DiBiasio was ever authorized to access PPTA e-mail accounts for the purpose of forwarding and keeping confidential PPTA information on his personal account after his

termination or to access PPTA's computer or e-mail systems after his termination for any purpose at any time.

Further, these acts each caused "damage" within the meaning of the Act because they compromised the privacy and security of PPTA's systems and led to the misappropriation of confidential and privileged information. *See* 18 U.S.C. §1030(e)(8). Finally, DiBiasio's conduct has caused PPTA to incur losses that meet and exceed the $5,000 threshold. The Act defines the term "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(l).

As a result of DiBiasio's conduct, PPTA's IT department and staff have had to divert their time and resources toward investigating and assessing the extent of the possible security breach and enhancing and monitoring PPTA's systems. Del Prete Decl. at ¶ 11.   PPTA has and continues to incur legal costs as its attorneys continue to seek inspection of DiBiasio's computers and to secure PPTA's confidential and proprietary documents and information.  Further, PPTA has been forced to hire a forensic computer expert to inspect DiBiasio's computer(s) when they are made available.   These costs alone exceed $5,000 in value.

It is therefore clear, even at this early stage, that DiBiasio's conduct meets all requisite elements of a Computer Fraud and Abuse Act violation.  PPTA has met and

exceeded its burden of showing a substantial likelihood of success on its claims, and is entitled to immediate injunctive relief.

## C.    PPTA Faces Irreparable Injury if this Motion is Not Granted

Every company has an interest in protecting its confidential business documents. *See Haught,* 417 F. Supp. 2d at 786. In this case, PPTA has a particular interest in maintaining the confidentiality of its e-mails and other documents because the nature of the information in these documents is sensitive. PPTA business related e-mails could contain supply data and distribution information from PPTA members, information regarding communications with government regulators, sensitive H/R information including performance reviews and salary information, lobbying strategies (both federal and state), confidential inter-office and intra-office communications, confidential financial budgeting information, communications with PPTA's North American Board and patient groups, and personal correspondence. *See* Del Prete Decl. at ¶ 10.

DiBiasio has already revealed certain of PPTA's confidential and privileged information to his attorneys, and further disclosures of additional, sensitive information could cause significant irreparable harm to PPTA, its members, and to third parties. Further, if DiBiasio is not ordered to produce his computer(s) for inspection, PPTA will never know the extent of the security breach or what confidential or privileged information is now sitting in DiBiasio's hands and out of its control. To prevent serious irreparable harm to PPTA, DiBiasio must be immediately enjoined from accessing or disclosing any PPTA confidential information or documents.

13

### D.    DiBiasio will Not Be Injured is the Motion is Granted

On the other hand, entry of a temporary restraining order will cause DiBiasio no harm other than the temporary inconvenience of being unable to use his personal computer(s) for the period of hours that PPTA's forensic computer expert will need to conduct the inspection. DiBiasio cannot complain of this inconvenience because he is legally obligated to produce his computer(s) for inspection, nor can he complain of any harm caused by the inability to persist in his unlawful activities or return documents that he was never authorized to possess. *See Storer Communications, Inc. v. Mogel,* 625 F.Supp. 1194 (S.D. Fla. 1985) ("Defendants will suffer no harm if an injunction is issued which simply requires them to obey the law"); *Midwest Guaranty Bank v. Guaranty Bank,* 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003) (a party "cannot place itself in harm's way, and then later claim that an injunction should not issue because of costs which it must incur to remedy its own misconduct.").

### E.    A Temporary Restraining Order and Injunction will Serve the Public Interest

Protecting legitimate business interests and the security of confidential and privileged information is in the public interest. *See Morgan Stanley DW Inc. v. Rothe,* 150 F.Supp.2d 67, 79 (D.D.C. 2001). Further, it is in the public interest that the reasonable terms of PPTA's Confidentiality Agreement be enforced. *See id.* (citing "the court's desire to see the terms of a reasonable contract enforced" as a "final factor tipping the public-interest scales to the plaintiff's side.").

### IV.    CONCLUSION

For the foregoing reasons, PPTA respectfully requests that this Court grant

PPTA's motion for a temporary restraining order and preliminary injunction.

Dated: June 18, 2007

By: ___/s/_____

David J. Ervin
Joanna E. Baden-Mayer
KELLEY DRYE & WARREN LLP
3050 K Street NW Ste. 400
Washington, D.C.  20007
Telephone: 202-342-8400
Facsimile: 202-342-8451

___/s/_____

Barbara E. Hoey*
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York  10178
(212) 808-7800
(212) 808-7897 (facsimile)

* Admitted *Pro Hac Vice*

# EXHIBIT "A"



**Plasma Protein Therapeutics Association**

## CONFIDENTIALITY AND NON-COMPETE AGREEMENT

This AGREEMENT is entered into between **Plasma Protein Therapeutics Association** (the Employer) and **Scott W. DiBiasio** (the Employee) upon the acceptance by the Employee of employment by the Employer or for the continued employment of the Employee by the Employer.

The EMPLOYEE agrees:

1. To refrain from, during the time of employment as well as after termination for any reason, revealing business or professional secrets or other personal or confidential information, related to the Employer or the Employer's clients, that he/she may have learned during the exercise of assigned functions or professional activities.
2. That all business-related and confidential information, including all copies in any form, is the property of the employer and to return to the Employer all such information, in whatever form stored, immediately upon termination for any reason.
3. That during his/her employment by the Employer and for a period of 3 months after the effective date of termination of employment, the Employee will not directly or indirectly, be employed by or provide services to any association, successor association, organization, society or other person or entity which was or is a client of the Employer, without the mutual agreement of the Employer and Employee.

The EMPLOYER and EMPLOYEE agree that this AGREEMENT:

1. Shall not be interpreted to constitute an employment agreement or obligate either party to continue the employment arrangement.
2. Shall not be interpreted in a way to prevent the Employee from performing the duties, functions, and responsibilities assigned by the Employer.

This AGREEMENT was executed on ___October 29, 2003___.

by: _____          _____
EMPLOYER                                      EMPLOYEE
Plasma Protein Therapeutics Association

147 Old Solomons Island Road · Suite 100 · Annapolis, MD 21401 USA
tel: 202.798.3100 · 410.263.8296 · fax: 410.263.2298 · e-mail: ppta@pptaglobal.org · www.pptaglobal.org
PPTA Offices in Washington · Annapolis · Brussels · Tokyo

# EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Scott W. DiBiasio,

                Plaintiff/Counter-Defendant

v.                                   Civil Action No. 1:07-cv-00300 (PLF)

Plasma Protein Therapeutics Association,

                Defendant/Counter-Plaintiff.

## DECLARATION OF TERRY DEL PRETE

Comes now Terry Del Prete, being of lawful age, and hereby declares as follows:

1.      My name is Terry Del Prete and I am employed by the Plasma Protein Therapeutics Association ("PPTA") as Vice President of Operations. In this position, my responsibilities include performance and management of duties in the Finance, Human Resources, Technology, Facilities and Office Management areas. I have personal knowledge of the facts stated herein and I am otherwise competent to testify. I submit this declaration in support of PPTA's Motion for a Temporary Restraining Order and Preliminary Injunction.

2.      On October 25, 2005, I called a meeting with Scott DiBiasio, Julie Birkofer (who was then Scott's direct supervisor), and Anna Weinstein (who was then a Senior Health Policy Analyst for PPTA) to discuss DiBiasio's recent accusation that Ms. Weinstein had made "conscious efforts to exclude him" from certain PPTA e-mails. This was approximately the eleventh meeting I had been required to call with Mr. DiBiasio that year to discuss various issues with his behavior and/or his inability to trust and work cooperatively with other staff members.

3.    During this October 25, 2005, meeting, Mr. DiBiasio informed me that since May 10, 2005, he had been forwarding all PPTA e-mails from his PPTA e-mail account to his personal e-mail account "for his own protection."

4.    Later that day, I informed Mr. DiBiasio that his employment with PPTA was being terminated due to his history of disruptive and unprofessional behavior and insubordination. At that time, I informed Mr. DiBiasio of his severance package and asked him to remove any of his personal belongings from his office and return any PPTA property that he may have had at his home.

5.    Subsequent to DiBiasio's termination, PPTA's IT department confirmed that DiBiasio had in fact been forwarding his PPTA e-mails to his personal e-mail account. A screenshot of DiBiasio's PPTA e-mail account captured subsequent to DiBiasio's termination, attached as Exhibit "A" hereto, shows a small portion of the PPTA business-related e-mails that DiBiasio forwarded to his personal e-mail account.

6.    On October 31, 2005, I asked Mr. DiBiasio to confirm that he had deleted all of the PPTA e-mails he claimed to have forwarded to his personal e-mail accounts. Mr. DiBiasio confirmed via e-mail on November 1, 2005 that such e-mails had in fact been deleted.

7.    I have reviewed Mr. DiBiasio's responses to PPTA's discovery requests, including the documents included in Attachments 4 and 7 to DiBiasio's responses to PPTA's First Set of Document Requests. Aside from the e-mails sent to or from DiBiasio's personal account subsequent to his termination, some of which are included in Attachment 4, these documents are all PPTA property which DiBiasio is not authorized to possess.

8.    In particular, the five page memorandum included as the first document in Attachment 7 was created by Ms. Birkofer on December 22, 2005, two months following DiBiasio's termination and following the date that Mr. DiBiasio filed an EEOC charge against PPTA.  Ms. Birkofer sent this memorandum to me via e-mail on December 22, 2005, so that I could forward to PPTA's counsel.    The e-mail was marked "CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED."  A copy of this e-mail is attached hereto as Exhibit "B."

9.    I instructed Ms. Birkofer to keep this memorandum completely confidential. I did not e-mail, share or discuss this memorandum with anyone other than PPTA's counsel.

10.    PPTA business-related e-mails contain sensitive information including, but not limited to, supply data and distribution information from PPTA members, information regarding communications with government regulators, sensitive H/R information including performance reviews and salary information, lobbying strategies (both federal and state), confidential inter-office and intra-office communications, confidential financial budgeting information, communications with PPTA's North American Board and patient groups, and personal correspondence.

11.    Since discovering that DiBiasio was in the possession of the confidential e-mails and documents described herein, PPTA staff, including myself and our Senior Manager of Information Systems and Facilities, have diverted our time and recourses toward investigating the source and extent of the apparent security breach and enhancing and monitoring our systems to prevent any further exposure.  For example, PPTA has been required to shut down remote access to our e-mail system for periods of time to

prevent unauthorized access, run and review diagnostic reports including audit trails on a more frequent basis, and require staff to change network passwords on a recurring basis.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: 6/18/07

Terry Del Prete

# EXHIBIT "A" TO DEL PRETE DECLARATION



GroupWise Find Results

File Edit View Actions Tools Accounts Window Help Export Spam

Display: Find Results

| CC | From | To | Name | Subject |
|---|---|---|---|---|
| dms: 0 documents found | | | | |
| Scott DiBlasio: 5236 items found | | | | |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Re: Fwd: Melissa Young |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Re: Fwd: Melissa Young |
| | Scott DiBlasio | Weinstein, Anna | Weinstein, Anna | Re: Fwd: Health Policy Steering Con |
| | Scott DiBlasio | Weinstein, Anna | Weinstein, Anna | Re: Fwd: Health Policy Steering Con |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Re: Fwd: Accounting Associate |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Re: Fwd: Accounting Associate |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [JCARR] JCARR listserv |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [HHS E-News] [Multiple Headli |
| | Scott DiBlasio | sdiblasio@comcast.net | sdiblasio@comcast.net | Fwd: [HHS E-News] [Multiple Headli |

Find results updated at 9:06AM on 2/3/06 Selected: 0 Total: 5236

From PPTA Address to his personal address

# EXHIBIT "B" TO DEL PRETE DECLARATION

**From:**      Julie Birkofer
**To:**        Terry Del Prete
**Date:**      12/22/05 5:54PM
**Subject:**   CONFIDENTIAL - ATTORNEY CLIENT PRIVILEGED

TD - please see attached.
j.

# EXHIBIT "C"

| | |
|---|---|
| **From:** | "Scott W. DiBiasio" <sdibiasio@comcast.net> |
| **To:** | Terry Del Prete <tdelprete@pptaglobal.org>, <sdibiasio@comcast.net> |
| **Date:** | 11/1/05 8:27AM |
| **Subject:** | Re: Status |

Terry:

Here are the responses to your e-mail requests.

1) To the best of my knowledge, the only states where I, as an individual, am registered to lobby on behalf of PPTA are Rhode Island and Arizona. I have taken care of terminating my registration to lobby on PPTA's behalf in Rhode Island as of today. There may be other reporting requirements for PPTA in Rhode Island (seperate from me as an individual). I'm not sure, but I doubt it since their reporting cycle is based on the legislative session (January to June). For Arizona see below.

2) There are a number of states where I had pending activities on PPTA's behalf. These should be evident to PPTA in my e-mail correspondence on my laptop and my files that remain on my laptop and on the SITF and HPSC drives.

3) Completed

4) I do not feel that it is appropriate for me to pick up my personal belongings in person. I request that they be securely packaged up and sent to my home (at PPTA expense).

5) I will package and return (via USPS Priority Mail) all previously requested PPTA property to you on Tuesday, November 1, 2005 (at my expense). You should receive it by the end of the week (no later than November 4, 2005).

6) Please send me the appropriate paperwork to transfer the cell phone contract to my name as of November 30 (as indicated by you on October 25, 2005). I will sign with original signature and return to you ASAP.

7) I will download the appropriate forms from the Arizona Secretary of State website this evening. I will fill them out and have them notarized (at my expense) tomorrow (November 1, 2005). They will be placed in FedEx on November 1, 2005. You will receive them in the AM on November 2, 2005. I will find out from FedEx the delivery cost. I request that the FedEx delivery cost be included in the $3,600 +/- reimbursement check that I am due.

8) I request that the reimbursement check be sent to my home along with my personal belongings.

9) On October 25, 2005 I requested a full and complete copy of my personnel file. I request that the requested copies of my personnel file be included with my personal belongings and expense reimbursement check. In addition, I do not believe that my reservation at the Marriott in San Diego for 10/26/05 to 10/30/05 was canceled. It is possible that I will request reimbursement for any charges associated with that reservation. I'll let you know when, and if, these charges

post to my American Express account.

Thanks in advance.  Please let me know if you have any questions.

Scott DiBiasio


Terry Del Prete wrote:

>Scott:
>
>Just wanted to followup on the voice mails I left at your home and on your cell phone today.  You and I
need to discuss the resolution of several items as listed below:
>
>1) List of states where you are a registered lobbyist on Behalf of PPTA (requested 10/26),
>2) List of states that where you have pending issues on behalf of PPTA as a lobbyist (requested 10/26),
>3) Confirmation of your deletion of all PPTA emails from your personal computer/system (requested
10/27),
>4) Pickup of your personal belongings from PPTA (requested 10/26),
>5) Drop off of the PPTA personal property (requested 10/26),
>6) Signature on form to transfer cell phone contract over to your name (new request,
>7) Your review and Signature on the Arizona Lobbyist Quarterly expenditure report for Q2 2005.  Will
need a notary as well.  This is due to the Sect'y of State in Arizona by 11/4.  This must be done
immediately as there is a fine of $1,000 per day until filed if it is late.  You received this report on 10/13/05,
so we must move quickly (requested this morning),
>8) Pickup of your expense reimbursement check (discussed 10/26 and will be distributed when the
above 8 items are resolved).
>9) Any other issues
>
>Another item of note is I believe that you have received from Cathy Izzi the separation package including
last payroll and severance payment.  Please do not hesitate to contact her with any questions regarding
continuation of benefits, etc.
>
>Please contact me today so we can discuss how we move ahead on the above items resolution.  The
best way currently as we are still having phone issues is via cell phone at 410.991.9563.  Please leave me
a voice mail if you do not reach me.
>
>Thanks,
>Terry Del Prete
>
>
>
>
>
>

# EXHIBIT "D"

**Subject:** Fwd: Missy Young
**From:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>
**Date:** Wed, 27 Jul 2005 10:36:12 -0400
**To:** <sdibiasio@comcast.net>

---

**Subject:** Fwd: Missy Young
**From:** "Patti Phillips" <pphillips@pptaglobal.org>
**Date:** Wed, 27 Jul 2005 10:36:11 -0400
**To:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>

Just in case you didn't get this one.

| | | Terry Del Prete 07/13/05 11:02AM >>>

Colleagues:

Missy Young will be leaving PPTA as of August 12, 2005.  She has quite a few changes in her next career choice.  She is going back to school to be an Esthetician.  That is two changes.  The third change is that school is back in her hometown of Cleveland.  Change number three.  Great news for Missy.  If you are like me, you will need to ask her what that person does!!

This is a big loss for PPTA.  Missy has been with us just under 4 years and has always been the consummate professional.  She always takes a sense of pride in her responsibilities and in developing systems and organizing workflow in the finance area.  We owe a great deal of thanks to Missy for continuing to add value to the Association.  She is organized and always looks to make things better.  She will be sorely missed.  We have begun the search process for her replacement.

Please join me in congratulating her on this new career choice and wishing her well in the move.

Best regards,
Terry

| **Fwd: Missy Young.eml** | **Content-Type:** message/rfc822 |

**Subject:** Fwd: Re: Fwd: Melissa Young
**From:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>
**Date:** Wed, 27 Jul 2005 12:07:22 -0400
**To:** <sdibiasio@comcast.net>

---

**Subject:** Re: Fwd: Melissa Young
**From:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>
**Date:** Wed, 27 Jul 2005 12:07:21 -0400
**To:** <melissa.e.evans@erac.com>

Checkout this bull$hit.

---

**Subject:** Re: Fwd: Melissa Young
**From:** "Terry Del Prete" <tdelprete@pptaglobal.org>
**Date:** Wed, 27 Jul 2005 11:05:08 -0400
**To:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>

SORRY AGAIN

MY FAULT.  I GOTTA DO IT AS A GROUP INSTEAD OF HUNT AND PECK I THINK.

| | | Scott DiBiasio 07/27/05 10:51AM >>>

Terry:

FYI.  This is another one that I did not receive.

SD

| | | Patti Phillips 7/27/2005 10:35:12 AM >>>

| | | Terry Del Prete 07/26/05 11:39AM >>>
Colleagues:

Pleas join us for a going away party for Missy Young!!!!! It is not a secret.

We have reserved space over at Sharkey's Bar and Pool room around the corner on Wednesday, August 10, from 5-7 PM . We will play pool, have some food and drinks and wish Missy well in her move back to Cleveland. MARK YOUR CALENDAR!!!

Directions and other specifics to come.

Thanks,
Terry

| Re: Fwd: Melissa Young.eml | Content-Type: message/rfc822 |

**Re: Fwd: Melissa Young.eml** | **Content-Type:** message/rfc822

**Subject:** Fwd: Re: Cell Phone
**From:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>
**Date:** Tue, 06 Sep 2005 10:34:17 -0400
**To:** <sdibiasio@comcast.net>

---

**Subject:** Fwd: Re: Cell Phone
**From:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>
**Date:** Tue, 06 Sep 2005 10:34:17 -0400
**To:** <melissa.e.evans@erac.com>

check this out

>>> Terry Del Prete 9/6/2005 10:18:27 AM >>>
Scott:

Based on your comment below about you knowing I was going to ask sooner or later, I get the impression that you are waiting for me to come to you with "questions" versus you coming to me to keep me in the loop of what is going on. I give you this piece of advice, if you think I will have a question about something, please let me know about it before I come to you. In this specific case, I would have come to you upon the submission of the expense report with the new phone on it if I did not see the bills and notices from Verizon. My point with this, is to come to me proactively to let me know that you needed to extend the contract and get a new phone. I am the executive in charge of our account (from Verizon's standpoint), so they look to me to work through the maintenance of our account. Adding the additional services is also not a problem, it simply the principal of making sure that I understand that the services are needed and that you talk about it before it is committed. Whether you leave PPTA and keep the number and equipment or not, just talking about it before a new two years is signed for is important. My answer would have been OK, just want to know up-front.

As for the phone, I make sure that all phone contracts are priced and have the right services for the individual staff members, so I always need to know what is going on with the phones. I review the bills every month to ensure that we have the best plan for the staff member. Most times if there is a change needed in a plan, it is an increase in minutes (like I did for you just recently). Matching service and needs is key here. I am aware of the two-year extension process for the new phone. It is the most cost effective way to add phones sometimes.

Julie was right to tell you to submit it. She understands and respects the process we have for professional charges/expenses. I would say the same thing. It is a PPTA phone and we would pay for that. If it were a pattern of losing the phone every week, maybe we would work something else out, but in this case it is not a problem at all. You do not have to reimburse PPTA for the mobile web or the text messages. If the added service makes it more efficient and effective for you, then that works. I only ask that you be cognizant of the added costs. The same was the case when you and I spoke about personal use of the phone when you first were given a phone. Just keep tabs on your costs as you know better what makes sense given your schedule and travel.

Thanks,
Terry

>>> Scott DiBiasio 09/06/05 08:42AM >>>
Terry:

Saw your note about cell phone. I knew you were going to ask sooner or later.

On August 13, 2005, I lost my cell phone on my way to Seattle (left it on an airplane). The next day, I went to the a Verizon Wireless store and picked up a new cell phone using my own personal funds. I felt that PPTA should not have to pay for something that was my fault. It was around $140.00. Evidently, that also required a 2-year extensive to the service agreement.

Subsequent to that time, Julie told me to go ahead and submit the cost of the phone on my expense report for reimbursement. In addition, I didn't think the contract extension was too much of a problem because when I leave PPTA, I intend to keep the cell phone (and number) and transfer the plan back over to my name.

As for the Mobile Web, I added that to my phone because it contains a lot of useful resources that are extremely helpful when I'm on the road (i.e., CNN, newspapers, flight schedules, e-mail, mapquest directions, weather, etc.). If this is a problem, I'd be more than happy to reimburse PPTA the $5.00/month. In addition, TXT messaging is sometimes a more effective way for me to communicate with Melissa...especially given time zone differences, or when I am in meetings. I usually tell her to try not to call me during the day when I'm in meetings, but to text message instead. Again, if you'd like for me to reimburse PPTA for the cost of the text messaging ($8.68 on this bill), I'd be more than happy.

Let me know if you have any other questions.

SD

**Fwd: Re: Cell Phone.eml** **Content-Type:** message/rfc822

Best regards,

Patti Phillips
Plasma Protein Therapeutics Association
147 Old Solomons Island Road, Suite 100
Annapolis MD 21401
Tel: 410.263.8296 ext 2107
Fax: 410.263.2298

The information in this e-mail is privileged and confidential. This e-mail is exclusively
addressed to and intended to be used by its addressee(s). If you have received this e-mail
mistakenly or are not the intended recipient, immediately contact the sender by e-mail (
pphillips@pptaglobal.org ), by telefax (410.263.2298), or by telephone (1.410.263.8296 or
1.202.789.3100). Any disclosure, distribution, photocopying or any action taken or omitted to
be taken related to this e-mail, is strictly prohibited.. PPTA is neither liable for the
proper and complete transmission of the information contained in this e-mail nor for any
delay in its receipt.

| Re: Fwd: Health Policy Steering Committee Emergency Conference.eml | Content-Type: message/rfc822 |
| --- | --- |

**Subject:** Fwd: E-mail from Terry
**From:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>
**Date:** Wed, 27 Jul 2005 10:34:33 -0400
**To:** <sdibiasio@comcast.net>

**Subject:** E-mail from Terry
**From:** "Scott DiBiasio" <sdibiasio@pptaglobal.org>
**Date:** Wed, 27 Jul 2005 10:34:33 -0400
**To:** "Patti Phillips" <pphillips@pptaglobal.org>

Patti:

Can you forward me the two e-mails from Terry DelPrete regarding Missy's replacement and the happy hour for Missy? For some reason I did not receive them.

Thanks.
SD.

| **E-mail from Terry.eml** | **Content-Type:** message/rfc822 |
|---|---|

Subject: Fwd: Re: Fwd: Health Policy Steering Committee Emergency Conference Call
From: "Scott DiBiasio" <sdibiasio@pptaglobal.org>
Date: Mon, 24 Oct 2005 17:15:57 -0400
To: <sdibiasio@comcast.net>

---

Subject: Re: Fwd: Health Policy Steering Committee Emergency Conference Call
From: "Julie Birkofer" <jbirkofer@pptaglobal.org>
Date: Mon, 24 Oct 2005 17:15:45 -0400
To: "Anna Weinstein" <AWeinstein@pptaglobal.org>, "Scott DiBiasio" <sdibiasio@pptaglobal.org>
CC: "Julie Birkofer" <jbirkofer@pptaglobal.org>, "Terry Del Prete" <tdelprete@pptaglobal.org>

Anna is accurate - - no information has been sent out to the HPSC other than the announcement for this call - I am waiting for a Medicaid analysis from GW.
j.

Julie A. Birkofer
Executive Director
PPTA North America
Suite 100
147 Old Solomons Island Road
Annapolis, MD 21401
Telephone:  202.789.3100
Facsimile:  410.263.2298
mobile:  202.997.0620
jbirkofer@pptaglobal.org

| | | Anna Weinstein 10/24/05 16:42 PM >>>

Happy to include you Scott, there was absolutely no intent to exclude you.  The only message that I sent out was this afternoon at the direction of Julie in response to a message she got from Dennis.  We are really trying to stay above water with all that is going on in the IVIG world and now and are scrambling to figure out what is going on with reconciliation both Medicare and Medicaid.

| | | Scott DiBiasio 10/24/05 04:33PM >>>

Anna:

I haven't seen any of the communication to the HPSC regarding Medicaid reform.  I've gotten a few inquiries on it from people that I work with regularly in the states and they've mentioned some previous e-mails, etc. that have gone to the HPSC.  I'd appreciate it if you could kindly copy me on any of those e-mails as this is an issue that we're going to be dealing with the fallout of in the states beginning in January.  Many thanks.

SD

| | | Patti Phillips 10/24/2005 1:21:26 PM >>>

Attached please find the following:

1) HPSC05057 - memo from Anna Weinstein regarding an emergency HPSC call regarding Medicaid reconciliation on Tuesday, October 25th at 4:00 p.m. (eastern) .

Please confirm your participation in this call with me via email at pphillips@pptaglobal.org by COB, today, Monday, October 24th .

If you should have any difficulties opening the attachment, please feel free to contact me at the Association.

# EXHIBIT "E"

CONFIDENTIAL - - ATTORNEY CLIENT PRIVILEDGED - - WORK PRODUCT

Julie Birkofer's notes from May 10, 2005 PPTA North America staff meeting.  That morning I was in my office with the door closed on a Health Policy Steering Committee conference call with Anna Weinstein (AW).  The heat built up in my office.  I quickly stepped out to turn on the air conditioning. As soon as I sat down, the AC stopped.  I got back up stepped out and turned on the AC.  Again, it was quickly turned off.  I stepped out and turned it back on and said aloud to no one in particular - - please don't turn off the AC, I'm dying of the heat in my office.  Scott then responded back that just because I'm the Executive Director doesn't give me the right to think I have the authority to control the AC.  I returned to my office.

After the conference call, I went in to Scott's office and asked him why he engaged with me on the AC with such emotion.  He said again very loudly that just because I'm the E.D., I don't have the right to control the AC because PPTA has a rule that no one touches the thermostats.  I told him that my office gets very warm because of the windows letting in sun and I was about to get sick.  That from my "window" I feel like someone on staff doesn't care if I'm getting sick from the heat and I said that I understood that from his "window" I was making it too cool for him to be comfortable.

Scott then segued into an accusatory statement that he is tired of not being respected in the Division and that he feels that I treat other team members with preferential treatment.  This statement struck me at my core and I took professional offense and disputed it with him.  He got very loud and said that he is tired of the preferential treatment that I show Anna and other team members.  I said that I treat of staff equally and fairly.  He got loud enough that others in the office heard him yelling at me that I give preferential treatment and that other team members feel the same way.

I was so stunned and struck by him remarks that I approached Terry Del Prete and asked if he would step outside of the building where we had an assurance of privacy to discuss this with me.  I told Terry that I felt I needed to address Scott's accusations quickly and deliver the same message to everyone on the N.A. team.  I discussed with Terry that I would like to call a N.A. team meeting immediately and tell everyone that I value each and every one of them and that I pride myself on my professionalism and put the issue of preferential treatment on the table.  This was such a busy time in the Division, we were one month out from the Association's annual meeting and we needed to act as a team.  Divisiveness could weaken the team and in my opinion would have impacted our ability to operate as a unit.

I called the team (Patti Phillips, Gretchen Wyatt, Scott DiBiasio and Anna Weinstein.  Danene Goffney called in.) together early in the afternoon.  I opened the meeting with a statement that I value each person on the N.A. team and that it was brought to my attention that some of you may feel that there is preferential treatment for some staff members.  I stated that nothing could be further from the truth and stated how much I value each person and the work they do.  I talked about how all the successes in N.A. are achieved through team work and that at times I do different things for different people but I always take into account what's best for the individual, the team and the Association.  Everyone seemed satisfied with the discussion and seemed to feel good, appreciated and respected.  I asked if anyone had any further comments.

Anna then spoke up and said that we should be honest and that she and everyone heard Scott yelling at me earlier in the day and that she heard him yelling her name several times and that she was tired of Scott singling her out.  Scott remained quiet.  Anna then said that all of the bad feelings started between her and Scott over the issue of the distribution of baseball tickets.  She continued to say that Scott accused Anna of getting her favorite team.  Scott then mumbled that he didn't believe her about the tickets.  Anna said that she was sick of the Red Sox thing.  From their things escalated quickly:

SD: Inappropriate comments to me, you may make more money than me – but it's not appropriate for you to talk to me in that tone. You are no more qualified than me.

AW: Just looking at him, shaking her head no.

SD: Yelling and very emotional: I am feeling sexually harassed right now over salary, office, time spent with the boss and the expense issue and I've talked to someone. The favoritism shown is bordering on illegal like the comments that you (Julie) made to Anna – Why don't you date the guy and be a plasma whore. Perception is reality and you (Julie) need to understand that in your position you need to treat everyone with kid gloves.

JB: I tried to explain to Scott that I do treat everyone equally and with respect.

SD: You say good morning to everyone else and not me, you unilaterally control the thermostat. In a management role you need to treat everyone with kid gloves. I am the only male in the office and I'm very uncomfortable now.

Then he took a breath and said he was ok and wanted to continue.

AW: Some of us work on the same issues and field calls and work late

SD: Don't go there - - working after you get home, I'm away from my family.

AW: Some of us talk more often and work more closely because of the issues

SD: (Directed to Julie) – You and Anna have a special relationship

JB: Anna and I are not friends - - we are professional colleagues

SD: Yes, you are friends at the Christmas party she went to your house

AW: (Directed to SD) You've got a chip on your shoulder and that's your friggin' problem.

Anna then exited the room to go get Terry Del Prete.

Terry entered the conference room and Anna very upset left the premises entirely.

SD – I know for a fact who likes what team.

TD – this is a symptom of a bigger issue. I sense you are genuinely uneasy and there is a heightened sense of sensitivities

SD: Perhaps I used the wrong term, sexual harassment, I may have a little paranoia There is a preferred relationship – you (Julie) made a comment to Anna to sleep with him and be a plasma whore.

JB – I admit I was wrong to say that and I apologize if the remark offended you, it was meant as a joke and said to Anna in the privacy of my office after business hours, I'm sorry you over heard it and were offended by it.

SD – Preferred relationship, she fell asleep in a meeting – I would have fired her on the spot for that but no she got a window office and makes more than I do.

JB – How do you know that?

SD:  I got wind of the information, I saw Julie's paper with her salary on it.  I'm the only guy in a department of females.

Terry excused the staff in the room. Now it's just Terry, Julie and Scott.

SD – There is a preferential relationship between Anna and Julie.  I don't want it blown out of proportion – it's just my personality to be paranoid.  I see things in a series of events – Anna got the window office, salary information I know, she's on the management team and I think to myself - - What am I not doing?

TD:  I manage the offices and pay attention to detail.  You have perceived she is paid more and she has more benefits.

SD:  Why is she (Anna) gone?  You let her.  Window office is offered to her it should have been offered to others.  Anna has a higher profile, reimbursement is more important so you offered Anna the window.

TD:  It's about respect and fairness

SD:  I've noticed that both her personality and the issues she works with causes Anna to think she's more important and Julie has developed a professional friendship with her, I am offended in her feeling that she's more important.

TD – Aw was hired because she has a pedigree resume, she makes more because she's uniquely qualified

JB – The role you do is your professional decision, the decision is made by the job function.  Reimbursement is a huge priority for the Association that's why she's on the Management Team.

TD – Rewards come in time.

SD – How do I get past this hump so I don't think negatively?

JB – You got a promotion.

SD – yes, but is she going to get a promotion, then I would think someone else's contribution is more important

TD – Assumptions have been made because you're a man- - some true, some not - - set aside assumptions such as JB doesn't give you enough attention, she's not touch feely

SD – On the organization chart my box and Ann's are equal, I've been led to believe we're equal

JB – wrong assumption.

TD – Let's talk about assumptions and relativity issues - - What do you benchmark your success against.

SD – I keep a scorecard.

TD: You are benchmarking against AW, remember you mentioned the org. chart issue.

JB: Scott, every decision I make is all business, you are simply saying that you would feel better if there was another male in the department.

SD: Anna has been given more exposure to the membership and more responsibility.

JB: No, you have independence in the states.

TD: Scott, you act in a certain way because they're females

SD – I know Anna said this to me - - How can you be a state lobbyist if you can't start a conversation.

SD – I consider AW a peer - - Josh Penrod and Brenda Norman are not, Anna is being treated better, Gretchen Wyatt feels the same. I want to make sure I don't fall behind, I want increased responsibilities to issues, more exposure to the membership, and increased access to Boards. I feel like I'm Not on the same rocket ship to stardom, what do I need to do so that she (Anna) doesn't get ahead of me. I hear and see a lot of things I don't want to hear and see. Anna shares information with Julie and she gets preferential treatment from Julie.

TD: I have a different relationship with Mike and Cathy. Scott is more reserved, not as outgoing.

SD: The bottom line is I'm getting a left out feeling and I can't speak for Gretchen Wyatt, but I'm feeling left out.

JB: Scott, maybe you've been on the road too much and out of the office.

SD: I'll be more sensitive in the office. I'd suggest you don't give her more attention and see how everyone will react. I struggle how to make friends in the office.

JB: I apologize if I don't give you enough attention or if I've said things that offend you.

TD: Virtue of necessity become friendly with AW.

SD: My feelings have been escalating. I've wondered how can I have these conversations about things that are bothering me - - conference calls and the thermostat.

JB: Scott I let you go to Marco Island with Baxter - - that was high profile and a perk.

TD: Scott you have a jealousy, you know Reimbursement is the top priority.

SD: State Affairs is a top priority.

JB: Let's talk about preferential treatment - - I let you travel, stay at nice hotels

Case 1:07-cv-00300-PLF    Document 12    Filed 06/18/2007    Page 47 of 81

SD: I realize my sensitivities and how I perceive things, a lot of it has to do with the fact that I'm in the middle of buying a house

SD: I want to be on our way to repairing our relationship, I have a lot going on with my house, closing, etc.

TD: Be better in the future, look at your self. Look at your box, see how far it goes, and ask yourself how far it will take me? Assess your value based on how far it will go and ask yourself what are the 6 things I need to do to get there.

SD: I don't have an analytical mind and Anna blew it out of proportion.

SD: I'm feeling sensitive and other things cascade into it - - know I'm asking myself how to repair it (relationship with AW.) I didn't realize AW had a problem with me, I am sensitive to her, I had no idea she had a problem with me. I get the impression she can't tolerate me

SD: I feel like I've come to a fork in the road - - I've though of leaving – the thought has crossed my mind.

JB: Scott, I want you to leave for a better opportunity, not because I can't manage the team.

SD: I'm a paranoid person, I'd like it to be ok.

JB: (To Scott) Yes, I value you and would never hurt you.

GroupWise WebAccess Message Item

## Mail Message

Close  Previous Next   Delete From   Delete From All   Forward Reply to Sender Reply All   Move Delete   Read Later Properties
                        This Mailbox      Mailboxes

**From:** Julie Birkofer
**To:** Terry Del Prete
**Date:** Tuesday - September 6, 2005 12:21 PM
**Subject:** Fwd: Dr. Appt.

Hmmmm.

>>> Scott DiBiasio 09/06/05 10:45AM >>>
I've got an urgent Dr. appt @ 11:30 in Bowie.  I'll be back as soon as I can.

SD

## Mail Message                                                    Novell.

| Close | Previous | Next | Purge | Undelete | Delete | Read Later | Properties |

**From:** Terry Del Prete
**To:** Julie Birkofer
**Date:** Tuesday - September 6, 2005 3:30 PM
**Subject:** Fwd: Re: Dr. Appt.

I think it was the "I am going to explode cause I can't manage my emotions" runout to breathe into a paper bag.

Course, that is just me.......

## Mail Message                                                                      Novell

Close    Previous    Next    Forward    Reply to Sender    Reply All    Move    Delete    Read Later    Properties

**From:** Anna Weinstein
**To:** Cathy Izzi
**CC:** Julie Birkofer
**Date:** Wednesday - December 21, 2005 3:38 PM
**Subject:** Re: Separation Information

Thank you Cathy. Please make sure to check the box so that the Fed-Ex person will leave the envelope if I am not home. I will be in the PPTA office at least part of the day next Wed. to tie up loose ends with Julie and to drop off my phone. Everything else is on my desk. There are receipts there that I need to attach to a last expense report so please leave them there. I also left gifts on my desk that I will distribute to my team next week. I am working from DC on finishing up the Lewin study, gathering my FTC related documents for Collier and finishing the IVIG Summit Group and PPTA comments due to CMS in early January. That will take me at least through the 30th. I will be at Collier tomorrow (Thursday).

I want you to know how deeply offended I am by the PPTA staff Christmas gift decision. I am upset not only by the fact that I was not given the gift that everyone else was but more importantly by the message it sends me about the organization's lack of appreciation for the major contribution I have made during my time there. I assume you didn't have a say in the matter, but I think it is absolutely outrageous that my reason for not being able to make it to the party is considered less acceptable than the others. My sister was in town from New York for a conference and stayed Friday night just to get some time with my mother and me. I very rarely get to spend time with her (and almost never without her fiance). It was unreasonable to ask her to leave my mother alone in DC or to drive all the way out to Edgewater (she doesn't even have a car) in the traffic to be my date. Secondly, I am Jewish and there is no reason I should be made to feel obligated to go to a Christmas party even if it is called a "holiday" party. I have never in my life heard of an organization that makes it mandatory for people to attend such a party to receive their thank you gift for the hard work done for the organization that year. I am terribly upset that after all I have given of myself to PPTA that is how I am treated. Even more insulting and petty is the fact that the three other people who missed the party (for their own personal reasons) got the gift check. I think it is sad on many levels that Jan did that. It leaves me with a very bad impression of the organization that I will certainly carry with me going forward. I wish you well and I am sorry things ended this way.

Sincerely,
Anna


Anna Weinstein
Senior Health Policy Analyst
Plasma Protein Therapeutics Association
147 Old Solomon's Island Road, Suite 100
Annapolis, MD 21401
Direct phone: (443) 433-1116
Office phone: (202) 789-3100 x2116
Mobile phone: (202) 669-2661
FAX: (410) 263-2298

E-mail: aweinstein@pptaglobal.org

http://mail.pptaglobal.org/servlet/webacc?merge=linkurl&Url.linkText=http://www.pptaglobal.org

The information in this e-mail is privileged and confidential. This e-mail is exclusively addressed to and intended to be used by its addressee(s). If you have received this e-mail mistakenly or are not the intended recipient, immediately contact the sender by e-mail (aweinstein@pptaglobal.org), by telefax (410.263.2298), or by telephone (1.410.263.8296 or 1.202.789.3100). Any disclosure, distribution, photocopying or any action taken or omitted to be taken related to this e-mail, is strictly prohibited. PPTA is neither liable for the proper and complete transmission of the information contained in this e-mail not for any delay in its receipt.

>>> Cathy Izzi 12/21/05 14:38 PM >>>
Dear Anna,

I will FedEx the package to your home.  If you have any questions, please feel free to contact me.

Best wishes,
Cathy

## Mail Message                                                                    Novell.

| Close | Previous | Next | Forward | Reply to Sender | Reply All | Move | Delete | Read Later | Properties |

**From:** Anna Weinstein
**To:** Julie Birkofer
**Date:** Sunday - November 20, 2005 10:31 AM
**Subject:** Re: Fwd: Position Opening-PPTA North America, Maryland

Eccellent. Maybe we can find a state Senator's staffer who is also a big sailor and wants to get out of whatever po dunk state they're in now????

Anna Weinstein
Senior Health Policy Analyst
Plasma Protein Therapeutics Association
147 Old Solomon's Island Road, Suite 100
Annapolis, MD 21401
Direct phone: (443) 433-1116
Office phone: (202) 789-3100 x2116
Mobile phone: (202) 669-2661
FAX: (410) 263-2298

E-mail: aweinstein@pptaglobal.org

http://mail.pptaglobal.org/servlet/webacc?merge=linkurl&Url.linkText=http://www.pptaglobal.org

The information in this e-mail is privileged and confidential. This e-mail is exclusively addressed to and intended to be used by its addressee(s). If you have received this e-mail mistakenly or are not the intended recipient, immediately contact the sender by e-mail (aweinstein@pptaglobal.org), by telefax (410.263.2298), or by telephone (1.410.263.8296 or 1.202.789.3100). Any disclosure, distribution, photocopying or any action taken or omitted to be taken related to this e-mail, is strictly prohibited.  PPTA is neither liable for the proper and complete transmission of the information contained in this e-mail not for any delay in its receipt.

>>> Julie Birkofer 11/19/05 13:52 PM >>>
AW - thanks for the suggestion, I wanted you to know that I did follow through.
j.

Julie A. Birkofer
Executive Director
PPTA North America
Suite 100
147 Old Solomons Island Road
Annapolis, MD 21401
Telephone: 202.789.3100
Facsimile: 410.263.2298
mobile: 202.997.0620
jbirkofer@pptaglobal.org

## Mail Message                                                                 Novell.

Close | Next | Forward | Reply to Sender | Reply All | Move | Delete | Read Later | Properties

**From:** Anna Weinstein
**To:** Julie Birkofer
**Date:** Friday - October 28, 2005 1:14 PM
**Subject:** Re: Fwd: Back of the envelope score calculation

Again, e-mail is easily misinterpreted as I am well aware and as you have recently pointed out to me. Your message is very curt and given all that I do for the organization working day and night and including opening my house to you and other members, I do not appreciate your tone at all. I am really actually quite tired of working nights and am going to start limiting that. I will get done what I can in eight hours a day. My life is no longer going to be PPTA.

Anna Weinstein
Senior Health Policy Analyst
Plasma Protein Therapeutics Association
147 Old Solomon's Island Road, Suite 100
Annapolis, MD 21401
Direct phone: (443) 433-1116
Office phone: (202) 789-3100 x2116
Mobile phone: (202) 669-2661
FAX: (410) 263-2298

E-mail: aweinstein@pptaglobal.org

http://mail.pptaglobal.org/servlet/webacc?merge=linkurl&Url.linkText=http://www.pptaglobal.org

The information in this e-mail is privileged and confidential. This e-mail is exclusively addressed to and intended to be used by its addressee(s). If you have received this e-mail mistakenly or are not the intended recipient, immediately contact the sender by e-mail (aweinstein@pptaglobal.org), by telefax (410.263.2298), or by telephone (1.410.263.8296 or 1.202.789.3100). Any disclosure, distribution, photocopying or any action taken or omitted to be taken related to this e-mail, is strictly prohibited. PPTA is neither liable for the proper and complete transmission of the information contained in this e-mail not for any delay in its receipt.

>>> Julie Birkofer 10/28/05 12:56 PM >>>
AW- don't take my feedback as criticism - it's simply how we can be more effective. Everyone at PPTA has been running around.

If the numbers are unfounded, provide constructive feedback to PC on how to improve it.
j.

Julie A. Birkofer
Executive Director
PPTA North America
Suite 100
147 Old Solomons Island Road
Annapolis, MD 21401
Telephone: 202.789.3100
Facsimile: 410.263.2298
mobile: 202.997.0620
jbirkofer@pptaglobal.org

>>> Anna Weinstein 10/28/05 12:32 PM >>>
I did talk to Patrick about these. Thanks for the input, I really appreciate it given all the running around I have been doing this week. These are TOTALLY unfounded numbers.

Anna Weinstein

Senior Health Policy Analyst
Plasma Protein Therapeutics Association
147 Old Solomon's Island Road, Suite 100
Annapolis, MD 21401
Direct phone: (443) 433-1116
Office phone: (202) 789-3100 x2116
Mobile phone: (202) 669-2661
FAX: (410) 263-2298

E-mail: aweinstein@pptaglobal.org

http://mail.pptaglobal.org/servlet/webacc?merge=linkurl&Url.linkText=http://www.pptaglobal.org

The information in this e-mail is privileged and confidential. This e-mail is exclusively addressed to and intended to be used by its addressee(s). If you have received this e-mail mistakenly or are not the intended recipient, immediately contact the sender by e-mail (aweinstein@pptaglobal.org), by telefax (410.263.2298), or by telephone (1.410.263.8296 or 1.202.789.3100). Any disclosure, distribution, photocopying or any action taken or omitted to be taken related to this e-mail, is strictly prohibited. PPTA is neither liable for the proper and complete transmission of the information contained in this e-mail not for any delay in its receipt.

>>> Julie Birkofer 10/28/05 12:07 PM >>>
AW - this is what PPTA should have been able to produce.

Julie A. Birkofer
Executive Director
PPTA North America
Suite 100
147 Old Solomons Island Road
Annapolis, MD 21401
Telephone: 202.789.3100
Facsimile: 410.263.2298
mobile: 202.997.0620
jbirkofer@pptaglobal.org

## Mail Message      Novell.

Close   Previous    Delete From This Mailbox    Delete From All Mailboxes    Forward Reply to Sender Reply All    Move Delete    Read Later Properties

**From:** Julie Birkofer
**To:** Terry Del Prete
**Date:** Wednesday - October 26, 2005 3:11 PM
**Subject:** Re: CONFIDENTIAL - comment

TD - I absolutely did not tell her, the only conversation I've had w/her is to thank her for her offer to provide external messaging, but tell her no thanks.
j.

Julie A. Birkofer
Executive Director
PPTA North America
Suite 100
147 Old Solomons Island Road
Annapolis, MD 21401
Telephone: 202.789.3100
Facsimile: 410.263.2298
mobile: 202.997.0620
jbirkofer@pptaglobal.org

>>> Terry Del Prete 10/26/05 15:09 PM >>>
JB:

So Marcia came into my office today when she was offering her help on the outside communications.

Anyway, when she was leaving, she said, "Scott, what a nut case, what kind of psycho send all of those emails to his personal account". I barely acknowleded the comment. I wonder how she found out that fact? I did not tell her, and I bet you did not. I did not tell Charles so he could tell her. HMMMMM?

So when did the Director of Worldwide communications get involved enough in HR to know these things?

TD

## Mail Message                                                                    Novell.

| Close | Previous | Next | Delete From This Mailbox | Delete From All Mailboxes | Forward | Reply to Sender | Reply All | Move | Delete | Read Later | Properties |

**From:** Julie Birkofer
**To:** Terry Del Prete
**Date:** Tuesday - September 6, 2005 3:27 PM
**Subject:** Fwd: Re: Dr. Appt.

>>> Scott DiBiasio 09/06/05 01:17PM >>>
Thanks for asking. Nothing wrong, just ran out of some of my medicine over the weekend and realized I didn't have any refills left and the Dr. won't call in prescriptions unless you see him.

>>> Julie Birkofer 9/6/2005 12:23:00 PM >>>
SD - No problem - sorry to hear this - -hope you're ok.
j.

>>> Scott DiBiasio 09/06/05 10:45AM >>>
I've got an urgent Dr. appt @ 11:30 in Bowie. I'll be back as soon as I can.

SD

## Mail Message                                                    Novell.

Close  Previous  Delete From This  Delete From All  Forward Reply to Sender Reply All  Move Delete  Read Later Properties
                 Mailbox          Mailboxes

**From:**  Julie Birkofer
**To:**  Anna Weinstein
**Date:**  Monday - July 18, 2005 2:50 PM
**Subject:**  Fwd: Re: Today's call

Mike contacted Scott via e-mail, he passed Ken's e-mail on to SD.

>>> Anna Weinstein 07/18/05 12:57PM >>>
Is it me or did you ask me to deal with the AMP/ASP issue? Why is Scott contacting Mike Bradley about this
and therefore making it seem like PPTA doesn't have a clue about what the difference is. I told Gretchen
this morning that I have the info. and ASP/AMP that you asked us for in your e-mail and that I'd deal with it.
This is FEDERAL Medicaid issue and I think it is in our purview not Scott's.

>>> Scott DiBiasio 07/18/05 12:53PM >>>

From what I'm told, its House Energy & Commerce that is driving AMP and Jeanne Haggerty is working on
the medication therapy management issue and the establishment of "add-ons". Ken trader indicates in a
separate e-mail that she is sympathetic to some of our issues. From what I know, AMP is the average price
paid to a manufacturer by wholesalers for drugs distributed to retail pharmacies (only). According to Mike
Bradley AMP is significantly lower than ASP since direct sales to HMOs and hospitals are excluded from
AMP. Also, AMP is a manufacturer calculated, non-published number and Mike indicates some sensitivities
in having to disclose AMPs in addition to ASPs.

SD

>>> Julie Birkofer 7/18/2005 10:30:10 AM >>>
See points below regarding Federal Medicaid reform - -

GW/DW - - we will need to do some Hill Visits on the issue of using J codes and not NDCs

GW - need an issue brief on Assuring Access to Plasma Protein Therapies in Medicaid Programs (focus on
access/choice, unique not interchangeable, benefit of NDC (brand specific) reimbursement v. J codes
(clustering)...

DW - need intel/info on who is driving the "medication therapy management" provision and who is driving
using J codes and not brand specific NDCs.

GW - also need to ramp up NCSL/Governor offices strategy

AW/GW - need to understand the difference in the AMP and ASP methodologies - - what is AMP, what does
in include or exclude that ASP does not.
tx,
j.

>>> Ken Trader < emtrader02@yahoo.com > 07/16/05 03:44PM >>>
Jan - I wondered why I was not seeing anything on the
initiative and realized today you were sending it to
my home email. I will get the numbers you are looking
for for HHS, but please, keep them confidential and do
not publish them except as aggregate numbers from all
those who submit.

Also, I was in DC with the other members of the
Hemophilia Coalition to Lobby on Medicaid reform. We

learned they are planning on using AMP vs. ASP as
their basis for their recommendation and cited Class
of Trade Issues as their reasoning. They are also
considering reimbursing on J-Code as opposed to NDC.
This, I believe, will impact access. What may be a
positive is that they are considering an AMP plus a %
(similar to Medicare's ASP plus 6%) They may also
consider allowing a "medication therapy management"
fee (MTM) for some therapies - We suggested they use
the Lewin Study that supported the Hemophilia Medicare
reimbursement decision.

All My Best
Ken
ken_trader@hemophiliahealth.com
615.850.5020

— Jan Hamilton < jan.hamilton@cox.net > wrote:

> Those who were on the call today were:Corey Dubin,
> Dave Cavanaugh, Julie
> Birkofer, Anna Weinstein, Patrick Collins, Paul
> Brayshaw, Kim Phelan,
> Meredith Zerbe and Jan Hamilton. Glen Mones was on
> jury duty and Sara
> Arnold sat in for Gavin Lindbergh and Dale Dirks.
>
> There were only 6 responses with ranking the Options
> and we pretty much
> decided it fell victim to summer and vacations, etc
> plus the many other
> things we have been working on including the
> Competitive Acquisition
> success.
>
> I pledged to re-contact the home care companies that
> has promised some data
> regarding numbers involved that we have not received
> as of this date. I did
> this after the call and added a couple other
> companies for insurance
> purposes. I asked each to let me know when I could
> expect to get the
> information and tentatively we have set the next
> call for three weeks from
> today. This could change depending upon receipt of
> the information. Upon
> receipt of the information, I will distribute it and
> the Options again and
> everyone will be asked to re-submit their rankings
> (1-2-3) based on the new
> data.
>
> One item discussed today was any reference to Part D
> and whether that might
> almost automatically throw us into Part D as hard as
> we have tried to stay
> away from it. Hemophilia is already being mentioned
> as a possible push
> toward Part D in the future.
>

> Another item that was discussed was that we might
> possibly want to stay away
> from the mention of 100% reimbursement and
> elimination of the 20% co-pay as
> being unreasonable in this climate.
>
> Thank you for your participation and your patience.
> This is a very
> important matter and a difficult one for a diverse
> group to reach an
> agreement on. One of the other problems is that we
> must realize that what
> starts with Medicaid is closely followed by Medicare
> and the Private Pay.
> Though this Medicare issue may not be a problem for
> a large percentage of
> our community today, as Medicaid tightens the belt,
> more people will be
> pushed to Medicare and then if the private pay
> industry follows Medicare's
> lead, the entire community will be affected. Our
> decisions are a heavy
> burden.
>

---

Yahoo! Mail
Stay connected, organized, and protected. Take the tour:
http://mail.pptaglobal.org/servlet/webacc?
merge=linkurl&Url.linkText=http://tour.mail.yahoo.com/mailtour.html

# EXHIBIT "F"

```
********************
***  TX REPORT  ***
********************

TRANSMISSION OK

TX/RX NO              4199
RECIPIENT ADDRESS     94636067
DESTINATION ID
ST. TIME              06/07 14:00
TIME USE              01'19
PAGES SENT            4
RESULT                OK
```

# KELLEY
## DRYE

# FACSIMILE TRANSMISSION

**TO**        Alan Lescht

**FIRM**      Alan Lescht & Associates, P.C.

**CITY**

**FAX**       Fax: (202) 463-6067

**PHONE**

**NO. OF PAGES**   4 (including this page)

**DATE**      June 7, 2007

**KELLEY DRYE & WARREN LLP**
WASHINGTON HARBOUR,
SUITE 400
3050 K STREET, NW
WASHINGTON, D.C. 20007-
5108
(202) 342-3400
FAX (202) 342-8451

**MESSAGE:**

**FROM**      Joanna E. Baden-Mayer

**PHONE**     (202) 342-8548

**E-MAIL**    jbaden-mayer@kelleydrye.com

NEW YORK, NY
WASHINGTON, DC
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT

# KELLEY
## DRYE

# FACSIMILE TRANSMISSION

| | |
|---|---|
| **TO** | Alan Lescht |
| **FIRM** | Alan Lescht & Associates, P.C. |
| **CITY** | |
| **FAX** | Fax: (202) 463-6067 |
| **PHONE** | |
| **NO. OF PAGES** | 4 (including this page) |
| **DATE** | June 7, 2007 |

**KELLEY DRYE & WARREN LLP**
WASHINGTON HARBOUR,
SUITE 400
3050 K STREET, NW
WASHINGTON, D.C. 20007-5108
(202) 342-8400
FAX (202) 342-8451

**MESSAGE:**

| | |
|---|---|
| **FROM** | Joanna E. Baden-Mayer |
| **PHONE** | (202) 342-8548 |
| **E-MAIL** | jbaden-mayer@kelleydrye.com |
| **TIMEKEEPER ID** | 71248 |
| **CLIENT NO.** | |

NEW YORK, NY
WASHINGTON, DC
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ
BRUSSELS

AFFILIATE OFFICES
JAKARTA
MUMBAI

**IF PROBLEMS OCCUR DURING TRANSMISSION PLEASE CALL (202) 342-8400.**

The information contained in this facsimile message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any use, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction.

**KELLEY DRYE & WARREN** LLP

A LIMITED LIABILITY PARTNERSHIP

3050 K STREET, N.W.

SUITE 400

WASHINGTON, D.C. 20007

——

(202) 342-8400

NEW YORK, NY

TYSONS CORNER, VA

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ

———

BRUSSELS, BELGIUM

———

AFFILIATE OFFICES
MUMBAI, INDIA

FACSIMILE

(202) 342-8451

www.kelleydrye.com

DIRECT LINE: (202) 342-8436

EMAIL: dervin@kelleydrye.com

June 7, 2007

**VIA FACSIMILE AND MAIL**

Alan Lescht, Esq.
ALAN LESCHT & ASSOCIATES, P.C.
1050 17th Street, N.W.
Suite 220
Washington, DC 20036

    Re:  Scott W. DiBiasio v. Plasma Protein Therapeutics Association
        Civil Case No. 1:07-cv-00300 PLF

Dear Mr. Lescht:

   I am writing to you about a potentially very serious matter, which requires your immediate attention.

   On May 30, 2007, we received the documents that you produced pursuant to PPTA's First Set of Document Requests to your client, Mr. Scott DiBiasio, in the above referenced matter. Attachment 7 to your responses to these requests, which you identify as responsive to PPTA's Document Request No. 33, includes a five page memorandum written by Ms. Julie Birkofer, Mr. DiBiasio's supervisor during his employment with PPTA. This memorandum summarizes events relevant to your clients termination from PPTA and is clearly marked, in bold capital letters on each page, "CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED – WORK PRODUCT." This memorandum was, in fact, prepared at the request of counsel subsequent to the filing of your client's EEOC claim. It was prepared at the direction of and given exclusively to Kelley Drye, it was not distributed within PPTA, and certainly was not given to your client.

   Also included in Attachment 7 are six e-mail communications between PPTA employees on PPTA accounts. Mr. DiBiasio is not identified as having sent or received any of these e-mails. Indeed, four of the six emails were written and sent after Mr. Dibiasio was terminated from PPTA, and thus no longer had access (or should not have had access) to the PPTA e-mail

Alan Lescht, Esq.
June 7, 2007                    **KELLEY DRYE & WARREN** LLP
Page 2

system. Curiously, Ms. Birkofer, however, is listed as either the author or recipient of each. These e-mails, like the privileged memorandum identified above, were never provided or made available to Mr. DiBiasio by either PPTA or Ms. Birkofer. It is also curious that the documents appear to have been printed out, or accessed, on May 14, 2007.

We would like to know from you, immediately, how you and your client came into possession of these confidential, privileged documents. PPTA has reason to believe that these documents were obtained by Mr. DiBiasio from Ms. Birkofer's PPTA e-mail account through improper, possibly criminal means. PPTA and Kelley Drye are deeply disturbed by their violation of privacy, intrusion into their e-mail account, and intrusion into the attorney-client relationship. We are currently exploring all of our options – but first demand an explanation from you and Mr. Dibiasio.

Finally, I would like to respectfully remind you of your ethical obligations as an advocate and member of the District of Columbia Bar. Under D.C. Rule of Professional Conduct 3.4, you owe a duty of fairness to the opposing party and counsel. Rule 3.4(a) states that "if...evidence received by the lawyer belongs to anyone other than the client, the lawyer shall make a good-faith effort to preserve it and to return it to the owner." Further, Rule 1.15(b), regarding safekeeping of property, provides that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third party." D.C. Bar Ethics Opinion No. 318 makes clear that failure to return privileged material to an opposing party when the lawyer has reason to believe that such material has been taken without authorization can constitute a violation of these and other rules of professional conduct:

> When counsel in an adversary proceeding receives a privileged document from a client or other person that may have been stolen or taken without authorization from an opposing party, Rule 1.15(b) requires the receiving counsel to refrain from reviewing and using the document if: 1) its privileged status is readily apparent on its face; 2) receiving counsel knows that the document came from someone who was not authorized to disclose it; and 3) receiving counsel does not have a reasonable basis to conclude that the opposing party waived the attorney-client privilege with respect to such document. *Receiving counsel may violate the provisions of Rule 8.4(c) by reviewing and using the document in an adversary proceeding under such circumstances and should either return the document to opposing counsel or make inquiry of opposing counsel about its status prior to determining what course of action to take.*

D.C. Bar Ethics Op. 318 (Dec. 2002) (emphasis added).

We cannot conceive of how your client could have explained to you his possession of a document clearly marked as "Attorney Client Privileged," or e-mails to which he was not a party. What is clear is that, absent some good faith basis to believe that he lawfully possessed

Alan Lescht, Esq.
June 7, 2007                    **KELLEY DRYE & WARREN** LLP
Page 3

those materials, you were under an obligation to return them to us and PPTA. All of these documents are PPTA property that should not have been in Mr. DiBiasio's possession, and the memorandum was conspicuously marked as privileged. That Mr. DiBiasio was not authorized to possess or disclose this material should have been obvious. Nonetheless, you are hereby notified that the materials in Attachment 7 to Mr. DiBiasio's responses to PPTA's document requests are PPTA property that Mr. DiBiasio is not and never has been authorized to either possess, disclose or distribute.

Please promptly return these and any other documents like them to PPTA, through the undersigned, and provide me with a written, signed confirmation that this has been accomplished. Also, please provide a written certification that Mr. DiBiasio has not and does not have access to any PPTA computer or server.

**Further, in light of the above, you are hereby placed on notice that we will request discovery of Mr. DiBiasio's laptop and any computer that he uses at home. Starting immediately, nothing is to be done to destroy, delete or modify anything on those computers.**

Very truly yours,

David J. Ervin

cc:  Susan Kruger, Esq.

# EXHIBIT "G"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SCOTT DIBIASIO,                      )
                                     )
            Plaintiff,               )
                                     )
      v.                             )    Civil Action No. 1:07-cv-00300 (PLF)
                                     )
PLASMA PROTEIN THERAPEUTICS          )
ASSOCIATION,                         )    **DEFENDANT'S REQUESTS FOR INSPECTION
                                     )    AND COPYING OF CERTAIN TANGIBLE
            Defendant.               )    THINGS IN THE POSSESSION, CUSTODY, OR
                                     )    CONTROL OF SCOTT DIBIASIO**
                                     )
                                     )

Plasma Protein Therapeutics Association ("PPTA") serves these requests for inspection and copying of certain tangible things upon Plaintiff Scott DiBiasio ("DiBiasio") as authorized by Federal Rule of Civil Procedure 34. Responses are due within 30 days of service hereof.

### TIME, PLACE, AND MANNER OF THE INSPECTION AND COPYING

The inspection will commence on July 9, 2007 at 9:00 am and continue from day to day as needed.

The inspection will take place at Scott DiBiasio's home, his attorney's offices, or such other place(s) as determined by the parties.

The inspection and copying will be conducted on PPTA's behalf by a computer forensics expert (the "expert"), the name and address of whom will be provided to Plaintiff prior to the inspection.

### DEFINITIONS

The following definitions apply to these requests for inspection and copying:

A.    "Computer" means any device that accepts information in the form of digital data (data converted into binary digital form) and manipulates it for some result based on a program or sequence of instructions on how data is to be processed. This includes, but is not limited to, a central processing unit, hard drive, system server, and any network file server computers that are under DiBiasio's direct control, or in any other environment such as a server that is sitting at a co-location facility or Internet Service Provider.

B.    "Data storage device" means any device or drive (including but not limited to a computer) that stores any kind of data, including computer programs, files, or documents. This definition includes any backup media (e.g., other hard drives, backup tapes, USB flash drives and other portable storage devices, floppies, Jaz cartridges, CD-ROMs) on which email, documents, or data, or logs of network use may be stored. It also includes Blackberries, mobile phones, or personal digital assistants (PDAs), such as Palm Pilot, HP Jornada, Cassiopeia or other Windows CE-based or Pocket PC devices.

## INSTRUCTIONS

1.    In accordance with Rule 34, please produce the tangible things requested in your custody or control as they are kept in the ordinary course of business.

2.    Production of each computer or data storage device must be made in its entirety without any alteration, deletion, expurgation, or tampering, and in a manner and condition in which the things were ordinarily kept by Mr. DiBiasio.

3.    With respect to each thing otherwise responsive to this request that has been lost, discarded or destroyed, identify (i) what tangible thing has been lost, discarded, or destroyed; (ii) its owner; (iii) the date of the loss (or date loss discovered) or disposal; (iv) the manner of the disposal; (v) the reason for the loss or disposal; (vi) each person who authorized the disposal;

(vii) each person who carried out the disposal; and (viii) each person with any knowledge concerning the disposal.

4.    With respect to each tangible thing otherwise responsive to these requests that is no longer in your custody or control, identify (i) what tangible thing has been lost, discarded, or destroyed; (ii) the last date on which the document was in your custody or control; (iii) each person now in control of the document; (iv) the reasons for the disposal or release of the document; and (v) each person with any knowledge concerning the document's disposal or release.

5.    If you claim that any tangible thing is privileged, or contains documents that are privileged or subject to protection as attorney work product under Federal Rule of Civil Procedure 26(b)(5), provide a privilege log that (i) sets forth the nature of the privilege claimed and the basis for the claim; (ii) identifies and describes the document and the reason for which it was created; (iii) identifies the creator of the document and all persons named on it, e.g. to whom the document was sent, for whose use it was prepared; and (iv) states the date of the document.

By following certain protocols, measures can be implemented to ensure that the expert's inspection and copying does not result in disclosure of privileged information.

6.    These Requests are continuing in nature and, in the event that you acquire any tangible things or knowledge of tangible things within the scope of any of the following Requests, you are required, in accordance with Federal Rule of Civil Procedure 26(e) to produce those things, and, where applicable, to supplement your responses to these Requests promptly.

## TANGIBLE THINGS TO BE INSPECTED AND COPIED

**Request for Inspection and Copying No. 1:**  All personal computers or data storage devices used or currently used by Mr. Scott DiBiasio.

KELLEY DRYE & WARREN LLP

Dated: June 8, 2007

By: _____

David J. Ervin
Joanna E. Baden-Mayer
KELLEY DRYE & WARREN LLP
3050 K Street NW Ste. 400
Washington, D.C.  20007
Telephone: 202-342-8400
Facsimile: 202-342-8451

Barbara E. Hoey*
Elizabeth A. Quinlan
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York  10178
(212) 808-7800
(212) 808-7897 (facsimile)

* Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I, Joanna E. Baden-Mayer, hereby certify that on June 8, 2007, I caused the foregoing Defendant's Requests for Inspection and Copying of Certain Tangible Things in the Possession, Custody, or Control of Scott DiBiasio to be served by first class mail, postage prepaid, upon counsel for Scott DiBiasio. by depositing the same in the U.S. mail in envelopes addressed as follows:

> Alan Lescht, Esq.
> Alan Lescht & Associates, P.C.
> 1050 17th Street, NW
> Suite 200
> Washington, DC 20036

Joanna E. Baden-Mayer, Esq.

# EXHIBIT "H"

## Ervin, David J.

**From:**    Alan Lescht [alescht@mindspring.com]
**Sent:**    Friday, June 08, 2007 9:16 AM
**To:**    Ervin, David J.
**Subject:** dibiasio v. ppt

Confirming our call yesterday, the document was shredded.

# EXHIBIT "I"

# KELLEY
## DRYE

# FACSIMILE TRANSMISSION

| TO | FAX | PHONE |
|---|---|---|
| Alan Lescht<br>Alan Lescht & Associates, P.C.<br>Washington | (202) 463-6067 | (202) 463-6036 |
| David J. Ervin<br>Kelley Drye & Warren<br>Washington | (202) 342-8400 | (202) 342-8451 |

**KELLEY DRYE & WARREN LLP**
**101 PARK AVENUE**
**NEW YORK, NEW YORK 10178**
**(212) 808-7800**
**FAX (212) 808-7897**

**NO. OF PAGES**     3 (including this page)

**DATE**     June 11, 2007

**MESSAGE:**     Please see the attached.

| | |
|---|---|
| **FROM** | Barbara E. Hoey |
| **PHONE** | (212) 808-7836 |
| **E-MAIL** | bhoey@kelleydrye.com |
| **TIMEKEEPER ID** | 00845 |
| **CLIENT NO.** | 732770-0602 |

**NEW YORK, NY**
**WASHINGTON, DC**
**TYSONS CORNER, VA**
**CHICAGO, IL**
**STAMFORD, CT**
**PARSIPPANY, NJ**
**BRUSSELS**

**AFFILIATE OFFICES**
**JAKARTA**
**MUMBAI**

**IF PROBLEMS OCCUR DURING TRANSMISSION PLEASE CALL (212) 808-5035.**

The information contained in this facsimile message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any use, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction.

NY01/HOEYB/1216558.1

## KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

**101 PARK AVENUE**

**NEW YORK, NEW YORK 10178**

(212) 808-7800

WASHINGTON, DC
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICES
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

BARBARA E. HOEY

DIRECT LINE: (212) 808-7836

EMAIL: bhoey@kelleydrye.com

June 11, 2007

**VIA FACSIMILE 202-463-6067**

Alan Lescht, Esq.
Alan Lescht & Associates, P.C.
1050 17th Street, N.W.
Suite 220
Baltimore, MD 21201

Re:     Scott W. DiBiasio v. Plasma Protein Therapeutics Assoc

Dear Alan:

As Dave Ervin I believe told you, I am working with him on this litigation. We received your email on Friday afternoon indicating that the attorney client privileged document, which was produced by Plaintiff last week, has been "destroyed." I am writing to make it clear to you that your email does not end this matter.

First, we would like a letter, on your letterhead, confirming that the original and any paper copies of the document have been destroyed. We will also request a separate, written certification signed by Scott DiBiasio confirming that all paper versions of the document which he had, likewise, have been destroyed.

**At the same time – WE DO NOT want Mr. DiBiasio to delete that or any documents from his computer hard drive.** We want to determine how the document came to reside on his hard drive. As requested in our letter of June 7, please instruct Mr. DiBiasio **not to delete or modify anything from his computer**.

Second, you agreed in a conversation with Dave Ervin last week to produce Mr. DiBiasio's computer for forensic inspection. We served you with Plaintiff's Notice for that inspection on Friday. Given that we have your consent to the inspection, I see no need to wait 30 days for you to formally respond to the Notice. Please let me know how many computers Mr. DiBiasio has and/or uses, and when we can have access to them to conduct the forensic inspection. Perhaps, assuming at least one computer is a laptop, Mr. DiBiasio could bring it with him to his deposition on Thursday and we could begin the inspection at that time.

**KELLEY DRYE & WARREN LLP**

June 11, 2007
Page Two

Lastly, on the subject of the privileged document and other internal PPTA emails which you produced in "Attachment 7" to Plaintiff's production – PPTA continues to be very disturbed by this issue. For one, and apart from the wholesale invasion of our attorney-client relationship, PPTA is concerned that their email and computer systems were somehow compromised by Mr. DiBiasio. We are also anxious to receive a written response to the questions in our letter of June 7, in which we asked for an explanation as to how Mr. DiBiasio came into possession of those emails.

We are still considering all options and reserve all rights in this regard.

Please get back to me on the computer inspection, so that we can make arrangements for the forensic examination.

I look forward to seeing you and Mr. DiBiasio on Thursday.

Sincerely,

Barbara E. Hoey

BEH:dd

cc:     David Ervin, Esq.

# EXHIBIT "J"

# KELLEY
# DRYE

# FACSIMILE TRANSMISSION

| TO | FAX | PHONE |
|---|---|---|
| Alan Lescht<br>Alan Lescht & Associates, P.C.<br>Washington | (202) 463-6067 | (202) 463-6036 |
| David J. Ervin<br>Kelley Drye & Warren<br>Washington | (202) 342-8451 | (202) 342-8400 |

**KELLEY DRYE & WARREN LLP**
**101 PARK AVENUE**
**NEW YORK, NEW YORK 10178**
**(212) 808-7800**
**FAX (212) 808-7897**

**NO. OF PAGES**     3 (including this page)

**DATE**                 June 12, 2007

**MESSAGE:**     Please see the attached.

| | |
|---|---|
| **FROM** | Barbara E. Hoey |
| **PHONE** | (212) 808-7836 |
| **E-MAIL** | bhoey@kelleydrye.com |
| **TIMEKEEPER ID** | 00845 |
| **CLIENT NO.** | 732770-0602 |

**NEW YORK, NY**
**WASHINGTON, DC**
**TYSONS CORNER, VA**
**CHICAGO, IL**
**STAMFORD, CT**
**PARSIPPANY, NJ**
**BRUSSELS**

**AFFILIATE OFFICES**
**JAKARTA**
**MUMBAI**

**IF PROBLEMS OCCUR DURING TRANSMISSION PLEASE CALL (212) 808-5035.**

The information contained in this facsimile message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any use, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction.

NY01/HOEYB/1216558.1

# KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

## 101 PARK AVENUE

### NEW YORK, NEW YORK 10178

(212) 808-7800

WASHINGTON, DC
TYSONS CORNER, VA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICES
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

BARBARA E. HOEY
DIRECT LINE: (212) 808-7836
EMAIL: bhoey@kelleydrye.com

June 12, 2007

VIA FACSIMILE

Alan Lescht, Esq.
Alan Lescht & Associates, P.C.
1050 17th Street, N.W.
Suite 220
Washington, DC 20036

      Re:    Scott W. DiBiasio v. Plasma Protein Therapeutics Assoc

Dear Alan:

      As discussed this afternoon, we are surprised to receive your letter canceling Mr. DiBiasio's deposition. This deposition has been scheduled for weeks, and has been re-confirmed with your office several times – most recently last week when we confirmed the exchange of documents and discovery.

      What has happened to so suddenly make Mr. DiBiasio unavailable?

      Also, when can we expect a response to my letter of yesterday.

      Most importantly, we need to know when we will get access to Mr. DiBiasio's computer. Please remind him again not to delete anything from it.

      PPTA was waiting for the deposition Thursday to ask Mr. DiBiasio, under oath, how he obtained its documents and whether he had any other property belonging to the PPTA. Since you are now canceling that deposition, we will have no choice to make a Motion and seek Injunctive relief – in order to obtain those materials.

      Lastly and equally seriously, we have another serious issue which we need to address with you. Yesterday, at **11 PM**. EST, multiple staff members at PPTA received "hang up" phone calls at their home. At that same time, multiple PPTA staff in Brussels also received

NY01/HOEYB/1216891.1

## KELLEY DRYE & WARREN LLP

Alan Lescht
June 12, 2007
Page Two


similar "hang up" phone calls at **5 PM** European time.  These calls came to home phones, some are which are unlisted numbers.  One call was to the home of the wife of the PPTA CEO.

       PPTA is currently investigating this matter.  Were are not in a position to accuse Mr. DiBiasio, **but we are very concerned**.  We trust that you will instruct your client not to engage in this, or any similar harassing or unlawful behavior.  Please confer with your client and make sure that his behavior is guided accordingly.

       You have promised to get back to us by tomorrow afternoon with an explanation for the cancellation of the deposition, and for more information as to the forensic inspection of the computer.

             Sincerely,

             Barbara E. Hoey

BEH:dd

cc:    Dave Ervin, Esq.